**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**HUBBARD/DOWNING, INC.,
d/b/a HANS PERFORMANCE
PRODUCTS,**

                              **Plaintiff,**

     **v.**                                              **1:10-cv-1131-WSD**

**KEVIN HEATH ENTERPRISES,**

                              **Defendant.**

**OPINION AND ORDER**

This matter is before the Court following the Court's May 30, 2013, Order

(the "May 30th Order) [65] finding Kevin Heath and NecksGen, Inc. (collectively,

"Defendants")[1] in contempt for violating the Court's August 22, 2011, Consent

Order (the "Consent Order") [37].  In the May 30th Order, the Court determined

that Plaintiff is entitled to an award of sanctions and its reasonable attorneys' fees

and expenses incurred as a result of Defendants' violation of the Consent Order.

---

[1]  Heath and his company, Kevin Heath Enterprises, were the original defendants
in this action.  On January 19, 2011, Plaintiff dismissed Heath from this case.
Plaintiff then initiated this contempt action currently before the Court against
Heath and NecksGen, Inc., a separate company owned by Heath.

The Court also directed Plaintiff to submit documentation evidencing the attorneys' fees and expenses incurred in prosecuting its Motion for Order to Show Cause.  On July 1, 2013, Plaintiff filed its Declaration and Supporting Documentation Evidencing the Attorneys' Fees and Expenses Incurred in the Prosecution of Its Motion for Order to Show Cause (the "Attorneys' Fee Request") [67].  On July 12, 2013, Defendants filed their Consolidated Motion and Brief Requesting Clarification of the Court's May 30, 2013, Order Regarding Sanctions Briefing and Requesting a Hearing Regarding Previously Unaddressed Issues (the "Consolidated Motion") [69].[2]  In the Consolidated Motion, Defendants opposed the amount of attorneys' fees claimed and requested to be heard on any sanction that might be imposed as a result of the Court's finding that they violated the Consent Order.

On November 7, 2013, the Court granted Defendants' request to respond to the sanctions claimed by Plaintiff and scheduled for December 13, 2013, a hearing at which the parties could present evidence regarding the sanction to be imposed.[3, 4]

---

[2]  The Court notes that Defendants retained new counsel after entry of the May 30th Order.

[3]  Defendants also moved to depose Norman Morgan and to require him to submit an expert report, claiming Plaintiff was relying on Morgan's expert opinions in advocating it requested lost profits sanction.  Because Morgan had testified at the March 12, 2013, hearing on Plaintiff's show cause motion and was subject to significant cross examination at that hearing, the Court determined that Morgan's

## I.   BACKGROUND

### A.   Procedural History

On April 16, 2010, Plaintiff HANS Performance Products ("HANS") filed an action for patent infringement against Kevin Heath Enterprises ("KHE") and Kevin Heath, asserting infringement of U.S. Patent No. 6,009,566 (the "'566 patent"), which pertains to a head and neck support device used by drivers of race cars and other high-performance vehicles (the "Underlying Action").  Plaintiff alleged in its Complaint [1] that KHE and Heath infringed the '566 patent by selling and offering for sale the DefNder G70, a similar head and neck support device (the "DefNder").

---

testimony at the December 13, 2013, hearing, even if he was called to testify as a fact witness, would be limited to those matters about which he testified at the March hearing.  Defendants' motion to depose Morgan thus is moot.
[4]  On October 28, 2013, Defendants also submitted a Notice of Supplemental Authority [83] in which Defendants referenced Ncube Corp. v. Seachange Int'l, Inc., 732 F.3d 1346 (Fed. Cir. 2013).  Because the notice does not request any relief, the Court declined to consider the notice as a request for action including a request to reconsider the May 30th Order.  The Court notes that the parties had entered into the Agreement and Consent Order to settle the patent case originally filed by Plaintiff in this litigation and in doing so, they simply elected to adopt a "no more than colorably different" standard as a settlement agreement contract term to be used in evaluating if Defendants were manufacturing, selling or offering for sale any products in violation of the Agreement and Consent Order.  Ncube simply discusses the well-established two-part analysis for determining whether a party violated an injunction against infringement of a patent, not whether a party violated a patent standard that parties decided to include in a settlement agreement and consent order.  Ncube does not apply to the litigation here.

On August 4, 2011, Plaintiff and Defendant KHE elected to conclude the litigation by entering into a Confidential Settlement Agreement (the "Agreement") to "settle, compromise, and resolve the Action."  (Mar. 12, 2013, Hr'g, Defs.' Ex. F).  The Agreement required that a Consent Order be entered by the Court and the Consent Order was attached as Exhibit A to the Agreement.   Heath signed the Agreement in his capacity as president of KHE.

On August 22, 2011, the Court entered the Consent Order requested by the parties.  The Consent Order provides:

> Plaintiff, Hubbard/Downing, Inc., d/b/a Hans Performance Products ("Hans"), and Defendant, Kevin Heath Enterprises, Inc. ("KHE"), having conferred and agreed upon an acceptable settlement of this case, hereby dismiss with prejudice all claims and defenses alleged in this case.  Each side shall bear its own costs.

> This Court shall retain jurisdiction as necessary to enforce the provisions of the applicable Confidential Settlement Agreement entered into by the parties.  The terms of the Confidential Settlement Agreement are incorporated into this Order and are enforceable as such.

(Aug. 22, 2011, Consent Order at 1).

B.    Summary of Settlement Agreement

The parties, in executing the Agreement, agreed to the following relevant terms:

> This Agreement (the "Agreement") is made and entered into by and between Hubbard/Downing, Inc. d/b/a HANS Performance Products

("HANS") and Kevin Heath Enterprises, Inc. ("KHE") (collectively, the "Parties"), and effective as of the 4th day of August, 2011 (the "Effective Date").

. . .

4.  KHE agrees to permanently cease from making, using, selling or offering for sale the DefNder G70, or devices no more than colorably different from the DefNder G70.

. . .

11.    This Agreement shall be binding upon and inure to the benefit of the parties hereto, their affiliates, licensees, successors and assigns. The parties will impose the obligations under this agreement upon any legal successors.

. . .

13.  This Agreement constitutes the entire agreement between the Parties and supersedes any and all other oral or written agreements relating to this subject matter.  No amendments or changes to this Agreement shall be effective unless made in writing and signed by the authorized representatives of each party.

(Agreement at 1-3).

C.    This Litigation and Contentions of the Parties

On March 28, 2011, KHE made to Plaintiff its offer to settle the Underlying Action.  On May 9, 2011, shortly after the parties began negotiating their settlement, Heath registered NecksGen, Inc., ("NecksGen") as a California corporation.  (Pl.'s Mem. in Supp. of its Mot. at Exs. 4, 5, 9).  The corporate registration lists Heath as NecksGen's corporate contact.  NecksGen and KHE

have the same board of directors, officers, office address, and fax number.

(Mar. 12, 2013, Hr'g Tr. at 31, 33, 66, 68).  In founding NecksGen, Heath testified

that he "wanted to make [his] own neck brace"[5] and needed a corporate vehicle

through which to do so.[6]  (Id. at 8).

On August 4, 2011, the parties entered into the Agreement, which Heath

signed as president of KHE.  On August 22, 2011, this Court entered the Consent

Order agreed to by the parties.[7]

Less than a year later, by about April 18, 2012, NecksGen began marketing

the NecksGen device.  (Pl.'s Mem. in Supp. of its Mot. at Ex. 7).[8]  The NecksGen

device is sold worldwide, except that Heath elected not to directly sell the

---

[5]  The DefNder device Heath and KHE were selling had been designed and manufactured by a company in China.  (Mar. 12, 2013, Hr'g Tr. at 10).

[6]  On June 27, 2011, NecksGen filed a trademark application in the United States Patent and Trademark Office ("PTO") for the trademark "NecksGen."  (Pl.'s Mem. in Supp. of its Mot. at Ex. 6).  Heath signed the trademark application in his capacity as president of NecksGen.  (Id.).  In the information fields of the application, kevinbheath@hotmail.com is listed as the email address of the applicant and the application lists the same physical address as KHE as the address for NecksGen.  (Id. at Exs. 6, 9).  The trademark is listed as being intended for use in association with a "[n]eckbrace for the automobile racing industry for injury prevention."  (Id. at Ex. 6).

[7]  On April 18, 2012, NecksGen, by Heath, its president, filed a Trademark/Service Mark Statement of Use in the PTO.  (Pl.'s Mem. in Supp. of its Mot. at Ex. 7).  In its Statement of Use, NecksGen states that the NecksGen mark was first used anywhere on May 27, 2011, and first used in commerce on February 29, 2012.

[8]  NecksGen currently markets its NecksGen Rev device.  Plaintiff has not claimed it violates the Consent Order.

NecksGen device in Georgia, in his attempt to avoid Plaintiff asserting an action against NecksGen in Georgia.  NecksGen marketed the NecksGen device on its website (www.necksgen.com), which in most material ways mirrors the website used to market and sell the DefNder device.  (Id. at Exs. 8, 10, 11).  Although NecksGen does not directly sell the NecksGen device in Georgia, it had been offered for sale in Georgia by Raceday Safety Company. [9]  (Mar. 12, 2013, Hr'g Tr. at 11).

On June 13, 2012, Plaintiff filed its Motion for an Order to Show Cause [38] on the grounds that Plaintiff became

> aware that Mr. Heath is seeking to evade this Court's Order by offering for sale in the United States a device no more than colorably different from the originally accused DefNder G70 device through the manufacture and sale of a head and neck device known as the "NecksGen" ("NecksGen device") by his corporation NecksGen, Inc. ("NecksGen"), Mr. Heath's successor company to Defendant KHE.

(Pl.'s Mem. in Supp. of its Mot. at 1-2).  In the motion, Plaintiff sought an order from the Court requiring NecksGen and Heath to show why they should not be held in contempt of the Consent Order and why injunctive and monetary relief should not be granted to Plaintiff for Heath and NecksGen's knowing violation of

---

[9]  Heath asserts that Raceday Safety is not authorized to sell the NecksGen device and that he does not know how Raceday Safety acquired the NecksGen device for sale.  (Mar. 12, 2013, Hr'g Tr. at 12).

the Court's Consent Order.  (Id. at 1-2, 22-25; Pl.'s Mot. for an Order to Show Cause at 2).

On February 8, 2013, the Court issued its Order for NecksGen and Heath to Show Cause why it should not be found in contempt.  A hearing on Plaintiff's show cause motion was held on March 12, 2013, at which Plaintiff, NecksGen, and Heath presented evidence and argument on: (1) whether NecksGen is bound by the Consent Order; (2) whether the NecksGen device is no more than colorably different from the DefNder device; and (3) whether NecksGen and Heath should be held in contempt for violating the Consent Order.  The Court also allowed the parties to submit written memoranda after the hearing.

The Court entered the May 30th Order after considering the parties' submissions and the evidence presented at the March 12, 2013, hearing.  In the May 30th Order the Court found, under both the "no more than colorably different" standard as applied in patent law and the common understanding of the terms agreed to by the parties in this case, that the NecksGen device is no more than colorably different than the DefNder G70 device.  The Court further found that Heath and NecksGen, being bound by the Consent Order, knowingly violated the Agreement and the Consent Order by manufacturing, selling and offering the NecksGen device and thus were in contempt of the Consent Order.

The Court also determined that consent decrees are enforced through the trial court's civil contempt power and that the Court has broad discretion in fashioning relief for civil contempt.[10]  Reynolds v. Roberts, 207 F.3d 1288, 1298 (11th Cir. 2000); McGregor v. Chierico, 206 F.3d 1378, 1385 n.5 (11th Cir. 2000) (citing United States v. City of Miami, 195 F.3d 1292, 1298 (11th Cir. 1999)).  The Court noted that an award of sanctions may serve either to (1) coerce the contemnor to comply with a court order, or (2) compensate a party for losses suffered as a result of the contemnor's act.  See McGregor, 206 F.3d at 1385 n.5.  Sanctions may be imposed to coerce the contemnor to comply with a court's order, but may not be so excessive as to be punitive in nature.  In re Application to Adjudge Trinity Indus., 876 F.2d 1485, 1493 (11th Cir. 1989) (citing United States v. United Mine Workers, 330 U.S. 258, 303 (1947); Florida Steel Corp. v. NLRB, 648 F.2d 233, 239 (5th Cir. 1981); and Lance v. Plummer, 353 F.2d 585, 592 (5th Cir. 1965) cert. denied 384 U.S. 929 (1965)).

---

[10]  Because this is a contempt proceeding, rather than a patent infringement case, the Court is not bound by the remedy provisions of the patent statute, although the Court is not prohibited from using patent infringement provisions and principles in considering a remedy in a contempt proceeding.  See Dow Chem. Co. v. Chem. Cleaning, Inc., 434 F.2d 1212, 1214-15 (5th Cir. 1970) ("In dealing with a civil contempt proceeding the district court [is] not bound by the provisions of Title 35, U.S.C. § 284.").

In establishing an amount to impose, the Court acknowledged that it must consider several factors, "including the character and magnitude of the harm threatened by continued contumacy, the probable effectiveness of any suggested sanction in bringing about compliance, and the amount of the contemnor's financial resources and consequent seriousness of the burden to him." Id. (citing United Mine Workers, 330 U.S. at 303).

Plaintiff here requests the Court to award Plaintiff its lost profits, to disgorge any of Defendants' profits resulting from the sale of the NecksGen device, and award Plaintiff its attorneys' fees and costs incurred to enforce the Consent Order. Plaintiff also requests the Court to double the award to it because NecksGen willfully and knowingly violated the Consent Order. (See Pl.'s Hr'g Br. [48] at 21-23). Plaintiff requested that Defendants be required to produce certain financial information for Plaintiff's use in determining Defendants' NecksGen sales in violation of the Consent Order.

In the May 30th Order, the Court found it appropriate to consider an award of Plaintiff's lost profits to compensate Plaintiff for losses it suffered as a result of Defendants' contemptuous conduct. See Howard Johnson Co., v. Khimani, 892 F.2d 1512, 1518-19 (11th Cir. 1990); Dow Chem., 434 F.2d at 1214. The Court observed that the ultimate sanction amount depended, at least in part, on the

level of sales of the NecksGen device and required Defendants to produce to

Plaintiff certain sales information to help determine the amount, if any, of

Plaintiff's lost profits.  The Court required Plaintiff to submit to the Court

documentation of its lost profits caused by the sale of the NecksGen device from

August 22, 2011, to the date of the May 30th Order.[11]  The Court further noted that

an award of reasonable attorneys' fees incurred in seeking contempt for violation

of the Court's Consent Order was appropriate in this action.

The Court has found, and the December 13, 2013, hearing confirmed, that

clear and convincing evidence supports that the Consent Order was valid and

lawful (a finding Defendants have not contested), that it was clear, definitive, and

unambiguous—including the "no more than colorably different" standard for

violation of the Consent Order agreed to by Heath—and that Heath clearly and

unambiguously had the ability to comply with the Consent Order entered.  See

McGregor, 206 F.3d at 1383.  In determining the sanction to impose, the Court

---

[11]  To the extent Defendants now question whether the Court found, by clear and convincing evidence, that Defendants violated the Consent Order, the Court notes this standard was applied throughout the May 30th Order, and the evidence presented at the December 12, 2013, hearing further supports, that Defendants' Consent Order violations were calculated, including because the testimony shows that Heath was aware of the patent claims that presented infringement problems to his design, that he tried —albeit unsuccessfully—to design around them, and that he declined for economic reasons to obtain a legal opinion whether his design violated Plaintiff's patent claims.  The sale of the NeckGen device was shown, by clear and convincing evidence, to violate the Consent Order.

considers the harm caused by Defendants' noncompliance, the probable

effectiveness of the sanction, Defendants' financial resources and the burden of the

sanction, and the willfulness of Defendants' conduct in violating the Consent

Order.  See In re Chase & Sanborn Corp., 872 F.2d 397, 401 (11th Cir. 1989).

Thus, the Court now determines the sanction to be imposed for Defendants'

violation of the Consent Order.

## II.   DISCUSSION

### A.   Lost Profits as a Sanction

The parties do not dispute that, to be awarded its lost profits as a civil

contempt sanction, Plaintiff "must prove a causal relation between [the sale of the

NecksGen device] and its loss of profits."  See Crystal Semiconductor Corp. v.

TriTech Microelec. Int'l, Inc., 246 F.3d 1336, 1353 (Fed. Cir. 2001).  "In others

words, the burden rests on [Plaintiff] to show a reasonable probability that 'but for'

the [NecksGen sales, Plaintiff] would have made the infringer's sales."  Id.

Plaintiff is not required to show causation to a certainty, rather only that there was

a reasonable probability that Plaintiff would have made the sales that Defendants

made of the NecksGen device.  See Am. Seating Co. v. USSG Group, Inc.,

514 F.3d 1262, 1268 (Fed. Cir. 2008); BIC Leisure Prods., Inc. v. Windsurfing

<u>Int'l Inc.</u>, 1 F.3d 1214, 1218 (Fed. Cir. 1993).[12]  A plaintiff may satisfy the "but

for" test by showing: (1) demand for its product; (2) the absence of non-infringing

substitutes; (3) it had the manufacturing and marketing capability to exploit the

demand; and (4) the amount of profit it would have made from the diverted sales.

<u>See</u> <u>Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.</u>, 575 F.2d 1152, 1156

(6th Cir. 1978); <u>Rite-Hite Corp. v. Kelley Co., Inc.</u>, 56 F.3d 1538, 1545 (Fed. Cir.

1995) (applying <u>Panduit</u> criteria).

In a two-supplier market, "it is reasonable to assume, provided the patent

owner has the manufacturing and marketing capabilities, that it would have made

the infringer's sales." <u>Micro Chem. v. Lextron, Inc.</u>, 318 F.3d 119, 1122 (Fed. Cir.

2003).  The two-supplier test thus "collapses the first two <u>Panduit</u> factors into one"

and requires a plaintiff to show:

> 1) the relevant market contains only two suppliers, 2) its own
> manufacturing and marketing capability to make the sales that were
> diverted [to the other supplier], and 3) the amount of profit it would
> have made from these diverted sales.

<u>Id.</u>; <u>see also</u> <u>Golden Blount, Inc. v. Robert H. Peterson Co.</u>, 438 F.3d 1354

(Fed. Cir. 2006).  In the two-supplier test, a plaintiff must first identify the relevant

market, and the market analysis must take into account whether there are devices

---

[12]  The parties rely on cases from the Federal Circuit to show what is required for
Plaintiff to prove its lost profits.  These authorities provide a persuasive analytical
framework to evaluate whether lost profits should be awarded in this case.

or substitutes similar in physical and functional characteristics to the plaintiff's device alleged to have been infringed.  Crystal Semiconductor, 246 F.3d at 1356. The plaintiff must show there is only one other supplier of devices or substitutes similar in physical and functional characteristics such that there are only two suppliers in the relevant market.

### 1.    *The relevant market*

Plaintiff argues that the relevant market is "the patented invention" and "also includes other devices or substitutes similar in physical and functional characteristics to the patented invention," excluding "alternatives 'with disparately different prices or significantly different characteristics.'"  See Micro Chem., 318 F.3d at 1124 (quoting Crystal Semiconductor, 245 F.3d at 1356).  Plaintiff argues the market here consists of only "yoke-style head and neck support" devices and "does not include head and neck supports that do not utilize a yoke-style restraint or that are not certified for use in racing events."  (Pl.'s Decl. and Supp. Docs. Evidencing Lost Profits [87] at 6).  Plaintiff conclusorily asserts that "simple observation of head and neck supports that do not utilize a yoke-style restraint demonstrates that they exhibit significantly different characteristics from the patented invention in design, comfort, and function."  Id.

Defendants disagree.  They claim that there are more than two suppliers in the market into which Plaintiff sells its patented device because there are a variety of devices that meet the SFI Foundation, Inc. ("FSI") head and neck support device standard, SFI 38.1, for use in high-performance racing vehicles.  (Defs' Resp. [89] at 8).  To support their contention, Defendants submit a list from SFI showing eight (8) head and neck support devices that meet the SFI 38.1 standard, including the Simpson R3 Device, Simpson R3 Rage Device, Simpson Hybrid Pro Device, Simpson Hybrid Pro Rage Device, Simpson Hybrid/Hybrid Rage Device, Simpson Hybrid X Device, the NecksGen Device, and Plaintiff's device.[13]  (Id. at Ex. 3 [89.3]).  Defendants also submit Jim Little's September 2012 survey comparing head and neck restraint systems "currently of interest to the market," which, in addition to those identified on the SFI list, includes three (3) other manufacturers of head and neck support devices.  (Id. at Ex. 4 [89.4]).  Plaintiff discounts that these other SFI 38.1 certified devices are included in the relevant market because they are not "yoke-style" support systems.  Plaintiff offers no evidence that these other devices are not sufficiently similar in physical and functional characteristics to Plaintiff's patented device to exclude them from the relevant market.

---

[13]  The Leatt Brace MRX Device was not available for sale during the time period relevant to this action.  (Dec. 13, 2013, Hr'g Tr. at 51:13-16).

It is undisputed that there are at least eight (8) head and neck support systems certified under SFI 38.1 for use in high-performance racing vehicles. That the NecksGen device is the only "yoke-style" device like Plaintiff's is not sufficient to show that only two devices, and therefore only two suppliers, exist in the relevant market here. The relevant market includes "devices or substitutes similar in physical and functional characteristics to the patented invention," excluding "alternatives 'with disparately different prices or significantly different characteristics.'" Micro Chem., 318 F.3d at 1124 (quoting Crystal Semiconductor, 246 F.3d at 1356). The test is not one of duplication of characteristics as Plaintiff suggests. That is, the market is not limited to only those that duplicate the characteristics of the patented device. It also includes those that are "*similar* in physical and functional characteristics" such that they may be considered by purchasers as alternatives to the patented device. Id. (emphasis added). Aware of this relevant market argument offered by Defendants, Plaintiff failed to offer, at the December 13, 2013, hearing or anywhere else in the record, sufficient or reliable evidence to show that Plaintiff's and the NecksGen devices differ significantly in physical and functional characteristics from the other SFI 38.1 certified devices. The relevant market thus may consist of at least eight (8) head and neck support systems, which are supplied by Plaintiff, Defendants, and at least one additional

supplier.  Plaintiff has failed to meet its burden to show that the two-supplier test applies in this action.

### 2.   *Demand and price elasticity*

Plaintiff also did not present evidence that a sale of the NecksGen device necessarily would have been a sale by Plaintiff.  The evidence presented showed that Plaintiff's device was materially more expensive than the NecksGen device, with the NecksGen device selling for $599 and Plaintiff's "most popular" device selling for $645-$695.  Plaintiff's denial of sale analysis is based solely on the testimony of Norman Morgan, who merely stated his assumption and who produced no market analysis, or even an analysis of NecksGen's sales, to show the impact of sales of the NecksGen device on Plaintiff's sales.[14]  Importantly, there also is no analysis that, in the absence of NecksGen devices, purchasers would only consider Plaintiff's device and not the other SFI 38.1 certified devices as a head and neck restraint option.  Plaintiff did not conduct a price comparison or price elasticity analysis, and there simply is no credible evidence that all sales of

---

[14]  Morgan, Plaintiff's only evidence on its lost profits claim, conceded the shortcomings of his device demand analysis.  At the December 13, 2013, hearing, he was asked: "Did you make any effort to analyze the demand for the products as a function of price?"  (Dec. 13, 2013, Hr'g Tr. at 59:8-9).  Morgan answered: "I did not do an analysis of that, no."  (Id. at 59:10).  He also acknowledged he had not done any analysis of the interchangeability of demand for the NecksGen device and Plaintiff's device.  (Id. at 60:21-61:3).  He admitted he had done no study of customer preference of yoked versus non-yoked devices.  (Id. at 64:5-7).

NecksGen devices necessarily would have been sales of Plaintiff's device, even though it is sold at a significantly higher retail price.[15]  Plaintiff fails to satisfy the first two criteria of the <u>Panduit</u> test to support its claim for lost profits.

3.    <em>Manufacturing and marketing capability</em>

Plaintiff also did not present sufficient evidence to show that it had the manufacturing and marketing capability to make the sales that were allegedly diverted from Plaintiff to Defendants.  Plaintiff claims it was at all times able to meet sales orders for its products and, even if not immediately, it was able to satisfy an order within approximately 30 days.  Morgan testified, however, that there were times when Plaintiff's devices were not available for significant periods, sometimes more than 30 days, and that he had not analyzed the impact

---

[15]  Morgan offers the following simplistic, self-serving conclusory statement in his declaration:

> The HANS device is a yoke-style device.  Having invented and created the motorsports head and neck restraint (HNR) business, the HANS device had been the only yoke-style device on the market for many years.  Non-yoke-style HNR devices are available.  Until the KHE/DefNder/NecksGen device entered the market, HANS had 100% of the yoke-style HNR business.

(Morgan Decl. [87.3] ¶ 9).  He later states that "[a] person purchasing a NecksGen device has selected a yoke-type HNR, thus eliminating the non-yoke-style devices from consideration."  (<u>Id.</u> ¶ 10).  From this unsupported, simplistic reasoning without any market, price elasticity or consumer preference research, Morgan concludes, and Plaintiff adopts his supposition, that at issue here is a two-product market.  The Court finds Morgan's "analysis" syllogistically flawed and his ultimate conclusion unrealistic and unpersuasive.

that this inability to fill orders had, then or now, on purchaser buying conduct. (Dec. 13, 2013, Hr'g Tr. at 61:4-62:10). Morgan admitted further that Plaintiff's lost profit theory was for "every sale [it] lost was directly the result of the sales by the defendant." (Id. at 63:7-11). The Court then asked: "And it is always a one-to-one correlation. But you don't know that for sure, do you? For example, if there is a supply problem, you don't know what percentage of those people would say I'm not going to wait three to four weeks?" Morgan responded: "No, I have no way of knowing that." (Id. at 63:12-17). Morgan also confirmed that he had "no study to know what percentage of those sales [of cheaper, non-NecksGen models] go to other manufacturers or other people," and acknowledged he had not conducted any studies of customer purchasing conduct. (Id. at 63:25-64:2). Plaintiff simply fails to provide any analysis showing customer response to inventory shortages and, specifically, whether availability would cause a purchaser to buy a device other than one manufactured by Plaintiff.

Plaintiff has not submitted evidence to support the demand for its product and absence of a non-infringing substitute in the relevant market—and certainly has not shown the existence of a two-supplier market—or the level of its sales that reasonably may have been displaced by sales of the NecksGen device. Plaintiff has, on several levels, failed to meet its burden to show that it suffered lost profits

19

or, assuming that it did, the amount of profits that were lost.  For these reasons, the Court does not have a sufficient basis to award lost profits as a sanction for Defendants' violation of the Consent Order.

B.      A Reasonable Royalty as a Sanction

In light of Plaintiff's failure to support its claim for lost profits as a sanction, the Court considers whether there is an alternative means of determining a sanctions award that would respond to damage Plaintiff suffered as a result of Defendants' sale of devices prohibited by the Consent Order.  Like the parties have done in this matter, the Court considers authority for awarding damages in a patent infringement case.  Section 284 of Title 35 addresses remedies for patent infringement, and provides:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court. When the damages are not found by a jury, the court shall assess them.  In either event the court may increase the damages up to three times the amount found or assessed.  Increased damages under this paragraph shall not apply to provisional rights under section 154(d) of this title.
>
> The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.

35 U.S.C. § 284.  "The methodology of assessing and computing damages under

35 U.S.C. § 284 is within the sound discretion of the district court." <u>TWM Mfg. Co. v. Dura Corp.</u>, 789 F.2d 895, 898 (Fed. Cir. 1986).

Where actual damage is not capable of being calculated, the Court must determine a reasonable royalty. <u>Hanson v. Alpine Valley Ski Area, Inc.</u>, 718 F.2d 1075, 1078 (Fed. Cir. 1983). "The royalty may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and defendant." <u>Rite-Hite</u>, 56 F.3d at 1554.[16] Where it is difficult to determine the reasonable royalty because the information available from the patent infringer is inadequate, the Court estimates a royalty using the best available evidence and resolves doubts against the infringer. <u>See Sensonics, Inc. v. Aerosonic Corp.</u>, 81 F.3d 1566, 1572 (Fed. Cir. 1996); <u>Lam, Inc. v. Johns-Manville Corp.</u>, 718 F.2d 1056, 1065 (Fed. Cir. 1983).

The Court has determined that sales of the NecksGen devices were in violation of the Consent Order and that Defendants are required to be sanctioned for this conduct. While Plaintiff failed to present sufficient evidence for the Court to determine any lost profits Plaintiff may have suffered, the undisputed evidence does show the number of NecksGen devices sold by Defendants and the price at

---

[16] When setting a reasonable royalty, courts often look to the factors identified in <u>Georgia-Pacific Corp. v. U.S. Plywood Corp.</u>, 318 F. Supp. 1116 (S.D.N.Y. 1970), <u>modified and aff'd</u>, 446 F.2d 295 (2d Cir. 1971). <u>See Powell v. Home Depot U.S.A., Inc.</u>, 663 F.3d 1221, 1239-40 & n.3 (Fed. Cir. 2011).

which those sales were made.  There also is in the record evidence that Plaintiff

licenses to foreign manufacturers the right to practice its patent and for which

Plaintiff receives, in return, a twelve percent (12%) royalty on sales.  (Dec. 13,

2013, Hr'g Tr. at 64:16-22; 65:19-22).  A reasonable royalty is an appropriate

alternate means to determine a remedy for infringement of a patent, and in this

case, violation of the Consent Order, including because a royalty reasonably

approximates the loss caused to Plaintiff as a result of Defendants' sale of products

that were no more than colorably different than the product for which Plaintiff held

its patent.  Here, an established royalty rate is available to approximate royalties

owed.  Rite-Hite, 56 F.3d at 1554.[17]

    A sanction in the form of a royalty takes into account "the character and

magnitude of the harm threatened by continued contumacy, the probable

effectiveness of any suggested sanction in bringing about compliance, and the

amount of the contemnor's financial resources and consequent seriousness of the

burden to him.  Trinity Indus., 876 F.2d at 1493-1494 (citing United Mine

Workers, 330 U.S. at 303).[18]  Here, Defendants have provided evidence that they

sold 4,201 NecksGen devices before discontinuing their sale.  Defendants sold the

---

[17]  Defendants suggested the reasonable royalty damage theory as the one the Court
should employ in this case.  (Defs' Resp. [89] at 13-16).

[18]  The Court notes that Defendants suggested that, if a sanction is to be imposed,
one based on a royalty would be manageable—albeit difficult—for them.

devices for $599 each, and thus sale of the NecksGen device generated revenues for Defendants of approximately $2,516,399.  Applying a twelve percent (12%) royalty rate to this aggregate sales figure, the Court determines that $301,967 is a reasonable amount to compensate Plaintiff for Defendants' sale of the NecksGen device in violation of the Consent Order.[19]  Based on the testimony of Defendant Heath and Rachael Lewis, an accountant for Defendants and whose testimony the Court finds credible and compelling, the Court determines that the royalty amount calculated produces a sanction that is consistent with Defendants' financial resources and which does not impose an unreasonable or unrealistic burden on Defendants.  Put another way, a royalty will compensate Plaintiff for past sales by imposing a sanction amount that considers Defendants' economic resources and ability to pay the sanction imposed.[20]

In imposing a sanction based on lost sales, the Court finds persuasive evidence has been presented—and Defendants have not really contested—that the sale of the NecksGen device did cause Plaintiff to lose sales.  Real harm was caused by Defendants' noncompliance with the Consent Order.  The amount of the

---

[19]  Plaintiff claims that the twelve percent royalty rate is not the rate at which it would license its technology for sales of devices in the United States.  Plaintiff, however, elected not to present any reasonable royalty evidence and, on the record here, the Court is limited to the twelve percent rate.

[20]  The Court also believes the royalty will have the concomitant effect of deterring Defendants from further violations of the Consent Order.

sanction to represent this harm—which the Court observes is less than, likely materially, the lost profits actually suffered by Plaintiff, but which Plaintiff was ultimately unable to prove—is tailored to Defendants' ability to pay the amount imposed considering their financial circumstances, and is sufficient to address the willfulness of their violating conduct.  See Chase & Sanborn, 872 F.2d at 401.

C.    Enhanced Damages

Plaintiff has not included in it submissions any legal authority or a factual basis for awarding enhanced damages and, even if it had, the Court would not award them.  The decision to sell the NecksGen device after entry of the Consent Order was made entirely by Defendant Heath.  The Court has heard his testimony now on two occasions—at the March 12 and December 13, 2013, hearings.  Heath testified that he made his decision to sell the competing NecksGen device believing that he had designed around Plaintiff's patent claims and thus, he thought, the device was more than colorably different than Plaintiff's device. Heath reached this conclusion without consulting a lawyer or other expert and he was motivated, in some substantial part, by his belief that he was bringing a better and safer design to the sport of racing.  Heath's decision-making process was fundamentally flawed, negligent and, arguably, irresponsible.  The Court, however,

does not find that he acted maliciously or recklessly and thus finds enhanced damages are not appropriate.

D.  Attorneys' Fees and Expenses

An award of attorneys' fees is an appropriate sanction response for civil contempt.  See, e.g. Shaefer Fan v. J&D Mfg., 265 F.3d 1282, 1290 (Fed. Cir. 2001); FTC v. Leshin, 618 F.3d 1221, 1237 (11th Cir. 2010).  A finding of willfulness is not a prerequisite to awarding attorneys' fees in a civil contempt action.  Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc., 793 F.2d 1529, 1535-36 (11th Cir. 1986).  The Court found in its May 30th Order, and the subsequent submissions and hearing have confirmed, that an award of attorneys' fees is proper and required in this action.

Plaintiff submitted its Attorneys' Fee Request seeking attorneys' fees in the aggregate amount of $280,428.50 and expenses in the amount of $9,170.04.   The fees claimed are facially unreasonable for a case that turned on the interpretation of the single phrase in the Agreement and Consent Order at issue in this litigation. That the fees claimed are beyond what any firm reasonably could charge is disclosed by a review of the fee elements.  In this relatively straightforward interpretation of, essentially, one part of one line in the Agreement and Consent

Order, Plaintiff employed the services of eight (8) lawyers.[21]  Their hourly rates ranged from $285 to $725 per hour, with most of the time billed by lawyers with hourly rates between $440 and $485 per hour.  A total of 589.8 hours were billed by five (5) lawyers to draft, file and conduct less than a one-day hearing on a motion to show cause, to draft written submissions on sanctions, and to attend a half-day hearing on sanctions.  On the preparation of its motion to show cause alone, 74.3 hours were billed to prepare Plaintiff's supporting memorandum [40], for which about $30,000 was charged.  The memorandum consisted of 25 pages. Plaintiff's Reply [43] was prepared using the services of five lawyers, who billed 50.9 hours to prepare a memorandum consisting of 10 pages, at a cost of approximately $20,800.  The hours expended reflect the significant inefficiency that results often in large law firms which unreasonably staff straightforward cases and bill at well-above market rates that are inconsistent with the market for legal services of the straightforward nature involved in this contempt proceeding. [22]

---

[21]  Actually, nine lawyers billed time to this matter.  Plaintiff even billed .7 hours of time by a senior patent lawyer whose billing rate is $725 per hour.

[22]  This action was brought originally as a patent infringement case by patent lawyers in a specialty patent firm.  It appears that when the case became a routine civil action to enforce a consent decree and interpret agreed-upon language in the Settlement Agreement, the firm continued to bill at its patent attorney billing rates and did not adjust them to reflect the more ordinary legal services being provided.

That inefficiencies exist is evidenced by the following examples of the statements submitted for review:

- For April 2012, Plaintiff's counsel billed $28,797 in time for services on this matter including: 35 hours to research and draft Plaintiff's initial submission.  This lawyer always billed in hour and half-hour increments, not once recording his time more precisely in tenths of an hour.  His drafting work alone totaled $20,250.

- On July 18, 2012, four different lawyers billed time to consider, draft and revise Plaintiff's Reply Brief.  Total billing that month was $22,659.

- On February 20, 2013, these lawyers collectively billed 19.5 hours working on the same brief.

- On March 11, 2013, the day before the hearing in this matter at which Plaintiff presented one witness, 6 lawyers billed 35.7 hours, valued at $15,627, to prepare for the hearing.  A few days before, on March 8, one of these lawyers recorded 13 hours (again in a round hour amount) for a fee of $6,305 to "prepare for contempt hearing."

(See generally Pl.'s Attorneys' Fee Request at Ex. 2 [67.3]).

The Court determines that a reasonable attorneys' fees award requires a significant reduction in hours to reflect the reasonable time that was required to litigate the issues in this case and a reduction in hourly rates to reflect that this essentially was non-patent litigation.  Based on the Court's experience in billing matters in private practice and in reviewing attorneys' fees and expenses submitted

for approval by the Court, the Court determines that the total fees that may

reasonably be awarded in this action, based on an average hourly rate of $400, are

$120,000.[23]   Thus, the total attorneys' fees and expenses reasonable to be awarded

in this case is $129,170.04.

## III.   CONCLUSION

Having found that Defendants shall be sanctioned for their violation of the

Consent Order and in imposing the sanction that it has, the Court has been careful

to calculate the sanction amount so that it deters future violation of the Consent

Order.  The evidence well-establishes Heath's intention to remain a retailer of

restraint devices and his propensity to proceed to market without careful or

reasonable evaluation of a product's potential to infringe the intellectual property

interests of others and, specifically, those of the Plaintiff.[24]   The Court, in imposing

this sanction, also has evaluated Defendants' resources and whether the sanction

imposed constitutes an unreasonable burden on Defendants.  Defendants expressed

their ability to pay sanctions based on a royalty calculation and attorneys' fees,

provided they are appropriately reduced from the amount claimed, and the Court

further independently determined that the sanctions imposed, even when the

---

[23]  The Court determines that expenses claimed in the amount of $9,170.04 are reasonable and adequately documented.

[24]  Deterrence of further violation of the Consent Order will be a byproduct of the sanction awarded in this case.

royalty and attorneys' fees amounts are aggregated, does not impose an unreasonable financial burden on Defendants, who have shown to be innovative and resourceful parties.  Accordingly, and for all the reasons stated above,

**IT IS HEREBY ORDERED** that Defendants shall be jointly and severally liable for sanctions in the amount of $301,967.00.

**IT IS FURTHER ORDERED** that Defendants shall be jointly and severally liable for attorneys' fees and expenses in the amount of $129,170.04.

**SO ORDERED** this 6th day of January, 2014.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE